# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| KENNETH J. BAUGH, | ) | CASE NO.   5:18-cv-02433 |
| | ) | |
| Petitioner, | ) | JUDGE SARA LIOI |
| | ) | |
| v. | ) | MAGISTRATE JUDGE DAVID A. RUIZ |
| | ) | |
| TIM BUCHANAN, Warden, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Respondent. | ) | |

Petitioner, Kenneth J. Baugh (Petitioner or Baugh), challenges the constitutionality of his conviction in the case of *State v. Baugh*, Tuscarawas County Court of Common Pleas Case No. 2016-CR-07-0183. Petitioner, *pro se*, has filed a Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. (R. 1). Warden Tim Buchanan (Respondent) has filed an Answer/Return of Writ. (R. 8). This matter is before the undersigned Magistrate Judge pursuant to Local Rule 72.2. For reasons set forth in detail below, it is recommended that the habeas petition be DENIED.

## I.  Summary of Facts

Factual determinations made by state courts are presumed correct in a habeas corpus proceeding instituted by a person in custody pursuant to the judgment of a state court. 28 U.S.C. § 2254(e)(1); *see also Franklin v. Bradshaw*, 695 F.3d 439, 447 (6th Cir. 2012) ("State-court factual findings are presumed correct unless rebutted by clear and convincing evidence."). The Fifth District Court of Appeals (state appellate court) summarized the facts underlying Baugh's

conviction as follows:

*Confrontation at Save-A-Lot*

[*P2]   This case arose on June 21, 2016, when appellant encountered Amy Baker at a Save-A-Lot in Uhrichsville, Ohio. Appellant and Baker had been in a relationship but Baker now had a new boyfriend, Axel Henry. Accounts differed about how these parties ended up at Save-A-Lot, but sometime in the early evening of June 21, appellant, Baker, and Henry confronted each other in the parking lot. Also present were Baker's father and uncle.

[*P3]   Baker and Henry were seated in her father's car and appellant walked up. Henry got out and confronted appellant; an argument ensued. Baker also got out of the car. At some point, appellant brandished a gun. Appellant and Baker argued, appellant reportedly struck Baker at least once in the face, and Baker "defended herself." Henry later told police appellant pointed the gun at him and at Baker, and Henry believed the gun to be a ".9 millimeter."

[*P4]   A Save-A-Lot employee was on a break outside the store when she observed the fight. She saw two men arguing and a woman trying to break them up. The employee recognized the woman as Amy Baker. One of the men struck Baker in the face at least once, but the employee did not know his name at first; she recognized him as a regular customer of the store. She saw the same man draw a gun and heard him threaten to shoot Baker.

[*P5]   The employee called 911 from a store telephone and reported a man pulled a gun and took off running in the direction of a school. Witnesses in the background of the call said the man's first name was "Kenny" and the employee provided his physical description.

*Witnesses observe Appellant's Flight*

[*P6]   A male witness who lived on Orchard Street was sitting on his front porch just after 7:00 p.m. when he noticed a man walking south on Orchard on the opposite side of the street. It was still daylight and the witness didn't notice anything unusual about the man. The witness then saw a Uhrichsville police car traveling south on Orchard, slowly as though the officer was looking for someone. The police car suddenly sped up and turned onto Franklin. A few moments later, the witness heard three distinct gunshots and took cover behind his porch bannister.

[*P7]   A female witness who lives on Herrick Street was outside on her front porch that evening. She didn't know appellant's name but recognized him because he frequently walked past her house on his way to Save-A-Lot. She knew appellant lived on Bank Street. This evening, she heard "at least one" gunshot and

observed appellant running through bushes and between apartment buildings across the street from her house. She wondered why appellant was running but several minutes later observed police officers walking down the street with weapons drawn.

[*P8]   A second male witness was living with his brother on Orchard Street on June 21, 2016. That evening, the witness's pickup truck was parked on the street in front of the residence. The witness was moving lumber from the back of the pickup truck to the rear yard of the house. On his first trip, he observed an older man in "raggedy clothes" walking up the street. When he came back for a second load, he saw a police car drive by with its lights on. The witness observed that "[his] neighbor's bush started shaking" and a man came out of the bush holding a gun.

[*P9]   The witness's eyes were fixed on the gun. He took off running toward his truck to take cover. As he started running, a police officer came around the corner from Franklin, on foot, and the witness heard gunshots. He dove down toward the front tire of his truck. He didn't recall how many shots were fired, but he heard "multiple" shots and the noise of bullets striking objects. The witness kept his eyes on the police officer from behind the truck. He couldn't see the gunman. He stayed down behind the truck until the officer told him it was safe to go into the house.

[*P10]   Later that night, police were in the street collecting evidence and they showed the witness a mark on the rim of his truck tire where it was struck by a bullet.

[*P11]   The witness acknowledged he did not look closely at the gunman's face because his attention was locked on the gun, but the man who came out of the bushes with the gun was dressed the same as the man who had walked down the street a few minutes before.

[*P12]   As of June 21, 2016, appellant was living in a house at 516 Bank Street with several other people, including Bryan Balder and Elena Poorman. Poorman testified that on June 21, 2016, appellant said he was going to meet Baker at Save-A-Lot and he was upset when he left. Poorman saw appellant again about 20 minutes later, walking quickly between apartment buildings, headed toward the woods. Very shortly after she saw appellant, police were at the house looking for him.

*Investigation and Shots Fired*

[*P13]   Ptl. William Ackerman and Ptl. Adam Gunnish are two City of Uhrichsville police officers who responded to the call of a man with a gun at Save-A-Lot. Witnesses told the officers appellant fled the scene; Gunnish took off

3

in pursuit and Ackerman remained behind to take statements.

[*P14]   Gunnish was in a police car traveling southbound on Orchard when he saw appellant, who matched the description given, walking quickly near the 300 block. Gunnish accelerated and appellant turned and noticed him. Appellant took off running and Gunnish lost sight of him on Franklin. He knew appellant was hiding in the bushes, so he stopped the car and got out. Gunnish did not have his weapon drawn. He yelled, "Police, you better get out here now" but appellant did not respond. Gunnish heard movement in the bushes and appellant emerged, running at a slow sprint which enabled Gunnish to close the distance between them quickly.

[*P15]   In front of a house on Orchard Street, appellant turned and fully looked at Gunnish. Prior to this moment, Gunnish had not seen a gun, but now appellant fired a shot at him. Gunnish began "sidestepping" toward a house as appellant watched him and tracked his movements with the gun. Appellant fired a second, deliberate shot at the officer, then a third.

[*P16]   As Gunnish drew his own weapon, he noticed the witness crouched behind the tire of the pickup truck. He decided to take cover because bystanders were in the area. He radioed "shots fired" as appellant continued to flee westward. Gunnish ran back to his patrol car but was unable to retrieve a shotgun. He tracked appellant on foot and made contact with the Herrick Street witness, who told him she saw a man running between apartments toward the woods.

[*P17]   At that point, Gunnish's pursuit of the suspect ceased.

[*P18]   In the meantime, Ptl. Ackerman had responded to the intersection of Orchard and Franklin in response to Gunnish's call of shots fired. Ackerman searched for the suspect on foot but didn't find him. Ackerman began to collect evidence after Gunnish told him appellant shot at him three times. Ackerman and Gunnish located one spent casing.

[*P19]   The officers learned the suspect's first name was "Kenny" and Gunnish identified appellant from a B.M.V. photo. They went to appellant's address on Bank Street and made contact with Bryan Balder. Officers found a box of .40 caliber ammunition of various makes in appellant's bedroom drawer. Appellant was not present at the Bank Street residence; nor was he found in a vacant house next door.

[*P20]   A witness reported appellant was moving across a field toward railroad tracks. Sgt. Brandon McCray and Ptl. Michael Hickman, a K-9 handler, arrived on the scene and began tracking appellant. The K-9, Ricon, indicated strongly on a scent track heading toward the railroad tracks. Hickman followed the track with Ricon leashed while McCray provided cover. It was now dusk and the woods

4

were dark. Hickman saw the silhouette of an individual walking into the woods and ordered him to stop, but the person didn't comply.

[*P21]   The officers dropped back and set up a perimeter around the area of the woods where they knew appellant was concealed. Hickman decided to advance into the woods with Ricon on a 30-foot leash. The dog entered a clearing ahead of the officer and engaged something; Hickman turned on his flashlight and saw appellant sitting on the ground in the middle of a briar patch. Ricon was biting appellant on the inside of his left thigh.

[*P22]   Appellant sat on his hands and refused to comply with orders to show them. Hickman had his service weapon out and was assisted by McCray. Hickman testified that appellant was strangely silent as he "took the bite" of the dog, saying nothing but refusing to show his hands. Eventually appellant relented and showed his hands, screaming "get the dog off."

[*P23]   No gun was found in appellant's vicinity. A second K-9, Zane, trained in detection of explosives, was brought in by Ptl. Chris Heslop of the Canton Police Department. Zane located ammunition in the area where appellant had been found. Eight live rounds were recovered. Police went into the woods the next day with a metal detector but the gun was never found.

[*P24]   Additional evidence was recovered from the scene of the three shots fired. Gunnish and Ackerman had already located one spent shell casing, and Zane found the two remaining spent casings nearby.

[*P25]   Appellant was cuffed and brought out of the woods dirty and disheveled; he required medical attention for the dog bite. As McCray walked him out of the woods, he Mirandized appellant, who was asking questions about why he was under arrest. Appellant said he went into the woods to sit and drink but officers testified there was no evidence found to corroborate the statement. Officers asked where the gun was and appellant said he wanted an attorney. Officers testified appellant therefore invoked his right to remain silent and questioning ceased.

[*P26]   Ackerman later encountered appellant at the Tuscarawas County Jail for the purpose of obtaining a D.N.A. sample. Appellant told Ackerman he should "be the next one to catch a bullet." No D.N.A. profile was recovered from the rounds of ammunition so no comparison was undertaken with appellant's sample. A gunshot residue test was also inconclusive.

*State v. Baugh*, 2018-Ohio-857, ¶¶1-42, 2018 Ohio App. LEXIS 902, 2018 WL 1216840 (Ohio Ct. App., Mar. 7, 2018).

## II. Procedural History

### A.    Conviction

On August 5, 2016, a Tuscarawas County Grand Jury indicted Baugh on five counts, as follows: Count One - attempted aggravated murder with two firearm specifications, Count Two - felonious assault with two firearm specifications, Count Three - having weapons while under disability with two firearm specifications, Count Four - assault, and Count Five - aggravated menacing. (R. 8-1, Exh. 1). On August 10, 2016, Baugh, through court-appointed counsel Mark Perlaky, pleaded not guilty. (R. 8-1, Exh. 2). On August 18, 2016, attorney Perlaky moved to withdraw due to Baugh retaining attorney Jose A. Iborra to represent him, a motion the court granted. (R. 8-1, Exh. 3).

On January 30, 2017, a jury found Baugh guilty as charged in Counts One, Two, Three and Five, but not guilty of Count Four alleging assault. (R. 8-1, Exh. 12). On February 24, 2017, the trial court sentenced Baugh to a prison term of eight years for attempted aggravated murder;[1] one year for having weapons while under disability, and ninety days for aggravated menacing. The court merged all firearm specification convictions into the seven-year firearm specification conviction associated with the conviction for attempted aggravated murder, but ordered that the sentence be served consecutive to the sentence for attempted aggravated murder. *Id*. The sentences for having weapons while under disability and aggravated menacing were ordered to be served concurrently with the sentence imposed for attempted aggravated murder. *Id*. The sentences resulted in an aggregate prison term of fifteen years. *Id*.

---

[1]  The felonious assault conviction was merged with the attempted aggravated murder conviction as an allied offense of similar import as requested by the State. (R. 8-1, Exh. 13).

**B.    Direct Appeal**

On April 3, 2017, Baugh, through new counsel, filed a Notice of Appeal with the state

appellate court. (R. 8-1, Exh. 14) He raised the following assignments of error:

1.    Appellant's convictions were against the manifest weight and sufficiency
of the evidence.

2.    Appellant's constitutional right against self incrimination was violated
when testimony was given concerning his request for an attorney.

3.    The trial court erred when it denied Appellant's motion to dismiss the
indictment when Appellant's right to a speedy trial was violated.

4.    Appellant was denied his rights to due process and of assistance of counsel
as guaranteed by the Sixth and Fourteenth Amendments of the United
States Constitution and Article I, Sections 10 and 16 of the Ohio
Constitution, because his trial counsel provided ineffective assistance
[sic].

(R. 8-1, PageID# 123, Exh. 15).

On March 7, 2018, the state appellate court affirmed the judgment of the trial court. (R. 8-1,

Exh. 17).

On April 13, 2018, Baugh, *pro se*, filed a Notice of Appeal with the Supreme Court of

Ohio. (R. 8-1, Exh. 18). In his memorandum in support of jurisdiction, Baugh set forth, as

propositions of law, the same four issues raised as assignments of error before the state appellate

court. (R. 8-1, Exh. 19). On July 5, 2018, the Supreme Court of Ohio declined to accept

jurisdiction of the appeal pursuant to S.Ct.Prac.R. 7.08(B)(4). (R. 8-1, Exh, 20).

**C.    Federal Habeas Petition**

On October 22, 2018, Baugh filed a Petition for Writ of Habeas Corpus and asserted the

following verbatim grounds for relief:

**GROUND ONE**: Appellant's convictions were against the manifest weight and
sufficiency of the evidence

7

**GROUND TWO**: Appellant was denied his constitutional right against self-incrimination was violated when testimony was given concerning his request for an attorney.

**GROUND THREE**: The trial court abused its discretion when it denied Appellant's motion to dismiss the indictment when Appellant's right to a speedy trial was violated.

**GROUND FOUR**: Appellant was denied his right to due process and of assistance of counsel as guaranteed by the Sixth and Fourteenth Amendment of the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution, because his trial counsel provided ineffective assistance.

(R, 1, PageID#  3-9).

### III.   Review on the Merits[2]

This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996

(AEDPA), 28 U.S.C. § 2254. *See Lindh v. Murphy*, 521 U.S. 320, 326-27, 337 (1997). The

relevant provisions of AEDPA state:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (1996).

Clearly established federal law is to be determined by the holdings of the United States

Supreme Court. *See Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Ruimveld v. Birkett*, 404 F.3d

---

[2] Respondent has not argued that the petition was filed beyond the statute of limitations, or that the petition contains unexhausted or procedurally defaulted claims.

1006, 1010 (6th Cir. 2005). However, an explicit statement by the Supreme Court is not mandatory; rather, "the legal principles and standards flowing from [Supreme Court] precedent" also qualify as "clearly established law." *Ruimveld*, 404 F.3d at 1010 (*quoting Taylor v. Withrow*, 288 F.3d 846, 852 (6th Cir. 2002)).

A state court's decision is contrary to clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. at 413. By contrast, a state court's decision involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. A federal district court, however, may not find a state court's decision unreasonable "simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly." *Id*. at 411. Rather, a federal district court must determine whether the state court's decision constituted an objectively unreasonable application of federal law. *Id*. at 410-12. "This standard generally requires that federal courts defer to state-court decisions." *Strickland v. Pitcher*, 162 Fed. Appx. 511, 516 (6th Cir. 2006) (*citing Herbert v. Billy*, 160 F.3d 1131, 1135 (6th Cir. 1998)).

**A.  Ground One: Manifest Weight and Sufficiency of the Evidence**

In ground one, Petitioner asserts that: (1) his convictions were against the manifest weight of the evidence; and (2) the State failed to present sufficient evidence to sustain his convictions. (R. 1, PageID# 3-5).

The court shall only address Petitioner's sufficiency argument, as manifest weight claims are not cognizable on federal habeas review.[3] *See, e.g., Nash v. Eberlin*, 437 F.3d 519, 524 (6th Cir. 2006); *accord Gibson v. Miller*, No. 5:15CV119, 2016 WL 6277229 at *1 (N.D. Ohio Oct. 27, 2016) ("contentions that a conviction is contrary to the manifest weight of the evidence also do not raise cognizable claims").

Turning to the sufficiency claim, the United States Supreme Court has "explicitly h[e]ld that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 363-64, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). The standard for determining if a conviction is supported by sufficient evidence is "whether after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 317, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979) (emphasis in original). "In making such a determination, a district court may not substitute its own determination of guilt or innocence for that of the factfinder, nor may it weigh the credibility of witnesses." *Wilson v. Tibbals*, No. 1:13CV00365, 2015 WL 1980714 at *5 (N.D. Ohio Apr. 30, 2015) (Pearson, J.) (*citing Walker*

---

[3] As explained in a decision from the United States District for the Southern District of Ohio, "under Ohio law, a claim that a verdict was against the manifest weight of the evidence—as opposed to one based upon insufficient evidence—requires the appellate court to act as a 'thirteenth juror' and review the entire record, weigh the evidence, and consider the credibility of witnesses to determine whether 'the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Hess v. Eberlin*, 2006 WL 2090093 at *7 (S.D. Ohio May 12, 2006) (*quoting State v. Martin*, 20 Ohio App. 3d 172, 20 Ohio B. 215, 485 N.E.2d 717 (Ohio Ct. App. 1983)). A federal habeas court does "not function as an additional state appellate court, vested with the authority to conduct such an exhaustive review," and, therefore, this court cannot decide whether Baugh's convictions were against the manifest weight of the evidence. *Id*.

10

*v. Engle*, 703 F.2d 959, 970 (6ᵗʰ Cir. 1983). Moreover, federal courts are required to give

deference to the state court's factual determinations and "[a]ny conflicting inferences arising

from the record, including credibility conflicts, should be resolved in favor of the prosecution."

*Heinish v. Tate*, 1993 WL 460782 at * 3 (6ᵗʰ Cir. 1993) (*citing Walker*, 703 F.3d at 969-70).

Furthermore, the Supreme Court has emphasized that a state court's determination as to

the sufficiency of the evidence is entitled to "double deference:"

> We have made clear that *Jackson* claims face a high bar in federal habeas
> proceedings because they are subject to two layers of judicial deference. First, on
> direct appeal, "it is the responsibility of the jury--not the court--to decide what
> conclusions should be drawn from evidence admitted at trial. A reviewing court
> may set aside the jury's verdict on the ground of insufficient evidence only if no
> rational trier of fact could have agreed with the jury." *Cavazos v. Smith*, 565 U. S.
> 1, ___, 132 S. Ct. 2, 181 L. Ed. 2d 311, 313 (2011) (*per curiam*). And second, on
> habeas review, "a federal court may not overturn a state court decision rejecting a
> sufficiency of the evidence challenge simply because the federal court disagrees
> with the state court. The federal court instead may do so only if the state court
> decision was 'objectively unreasonable.'" *Ibid*. (quoting *Renico v. Lett*, 559 U. S.
> ___, ___, 130 S. Ct. 1855, 176 L. Ed. 2d 678 (2010)).

*Coleman v. Johnson*, 132 S. Ct. 2060, 2062 (2012); *accord Gipson v. Sheldon*, 2016 WL

4887471 at **14-15 (6ᵗʰ Cir. Sept. 14, 2016) ("AEDPA and *Jackson* together create two layers of

judicial deference: First, we must defer to the jury's rational conclusions drawn from the

evidence…. Second, we must defer to the state court's decision rejecting a sufficiency of the

evidence claim.") (internal citations omitted).

Petitioner argues that "there was n[o] physical or scientific evidence presented at trial that

linked [him] to a firearm." (R. 1, PageID# 4-5). Therefore, Plaintiff contends his convictions for

felonious assault, having weapons under a disability, attempted aggravated murder, and all

associated firearm specifications were not supported by sufficient evidence. *Id*. Petitioner's

argument is bereft of any meaningful legal authority, as was appellate counsel's corresponding

11

argument below. Petitioner concedes that Officer Gunnish testified at trial that Petitioner had a firearm and fired at him three times, yet maintains there was no video evidence corroborating Gunnish's testimony despite the officer having a body camera. *Id*. Petitioner, however, cites no statutory or other legal authority suggesting that physical, scientific, or video evidence is a prerequisite to supporting a conviction for any of the aforementioned offenses or that eyewitness testimony alone is insufficient.[4] (*Id*.; see also R. 8-1, PageID# 137-139). The state appellate court addressed this argument as follows:

> [*P55]   Appellant next argues his conviction of having weapons under disability is against the sufficiency and manifest weight of the evidence because no evidence at trial connected him to any firearm. To the contrary, several of appellee's eyewitnesses testified appellant possessed and brandished a gun, from the confrontation at Save-A-Lot to firing on the police officer. Additionally, Gunnish identified appellant as the man who fired on him three times.

> [*P56]   Appellant further argues his felonious assault conviction is against the sufficiency and manifest weight of the evidence because there is no evidence linking him to a firearm, but alternatively if he did fire shots at Gunnish, he wasn't trying to harm the officer but to avoid apprehension. A person acts "knowingly" when, "regardless of his purpose, * * * he is aware that his conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B); *State v. Thomas*, 5th Dist. Stark No. 2010CA336, 2011-Ohio-4441, ¶18. Gunnish testified that appellant turned to him and faced him fully, shot at him once, "tracked" him as he ran, and shot twice more. Appellant has presented no authority suggesting shooting at a police officer three times is not a knowing attempt to cause serious physical harm. *See, State v. Smalls*, 5th Dist. Stark No. 2000CA00133, 2001 Ohio App. LEXIS 2244, 2001 WL 520977, *3 (May 7, 2001) [testimony established appellant fired three rounds directly at police

---

[4] "A firearm enhancement specification can be proven beyond a reasonable doubt by circumstantial evidence." *State v. Thompkins*, 1997-Ohio-52, 78 Ohio St. 3d 380, 678 N.E.2d 541 (Ohio 1997); *see also State v. Bryant*, 2016-Ohio-4928 at ¶35, 2016 WL 3667910 (Ohio Ct. App. Jul. 11, 2016) ("Although appellant takes issue with the fact that a handgun was never located and tested for operability, this court has stated that 'the recovery of a firearm used in a criminal offense is not required to prove that a particular firearm was operable at the time of the crime.'")

officers sufficient to prove felonious assault and not against manifest weight of evidence].

*Baugh*, 2018-Ohio-857 at ¶¶55-56. The court finds nothing unreasonable or contrary to clearly established federal law in the state court's finding that the testimony of multiple individuals was sufficient to establish that Baugh possessed, brandished, and ultimately fired a gun, and that recovering the gun was not a prerequisite to sustain the convictions.

Turning to Petitioner's argument that there was insufficient evidence to support his conviction for aggravated menacing, the court finds nothing unreasonable about the state appellate court's determination that Petitioner "cause[d] another to believe that the offender will cause serious physical harm…." O.R.C. § 2903.21(A). The state appellate court disagreed with Baugh's underlying argument, finding as follows:

[*P53]   Appellant first argues his conviction for aggravated menacing is against the sufficiency and manifest weight of the evidence because Amy Baker, the purported victim, was the aggressor in the confrontation and appellee did not prove beyond a reasonable doubt that Baker believed appellant would harm her. Upon our review of the record, Baker testified appellant pulled a gun and "exchanged words" with her, then punched her in the face. The Save-A-Lot employee saw appellant with the gun and heard him threaten to shoot Baker. The determination as to whether statements are threats of serious physical harm is to be made by the trier of fact, in this case, the jurors. *State v. Davis*, 5th Dist. Stark No. 2001CA00186, unreported, 2002 WL 221069, *2 (Feb. 11, 2002). It was within the jury's province to determine if appellant's statements were meant to convey a threat of serious physical harm. *Id*., citing *State v. Jamison*, 49 Ohio St.3d 182, 552 N.E.2d 180 (1990), *cert. denied*, 498 U.S. 881, 111 S. Ct. 228, 112 L. Ed. 2d 183 (1990).

[*P54]   As to Baker's belief that appellant would cause her serious physical harm, the credibility of the trial witnesses was a matter for the jury to determine. *State v. Yarbrough*, 95 Ohio St. 3d 227, 231, 2002-Ohio-2126, 767 N.E.2d 216. We find the jury could reasonably have found all of the elements of aggravated menacing established beyond a reasonable doubt. In light of the uncontroverted evidence, we cannot find the jury lost its way in finding appellant guilty of

> aggravated menacing. *State v. Ford*, 5th Dist. Stark No. 2014CA00145, 2015-Ohio-4093, ¶ 26.

*Baugh*, 2018-Ohio-857 at ¶¶53-54. Petitioner contends that the victim, Baker, would never have struck him if she had believed he posed a threat to her. (R. 1, PageID# 4). Petitioner's argument fails to accurately represents Baker's testimony in its entirety. She clearly testified that Petitioner walked up to the car in which she, her boyfriend, and her father were sitting; that Petitioner pulled a gun out as he approached the car; that Petitioner punched her in the face after she exited the car; and that she then defended herself. (R. 8-4, PageID# 353; Tr. 267). There was nothing unreasonable about the state court's determination that a rational trier of fact, under these circumstances, could have found that Baker believed Petitioner would cause her serious physical harm.

Finally, Petitioner asserts his conviction for attempted aggravated murder was not supported by sufficient evidence because the State did not prove beyond a reasonable doubt that he had the specific purpose to kill Officer Gunnish. (R. 1, PageID# 5). The state appellate court rejected this argument, finding as follows:

> [*P57]   Finally, appellant contends his conviction for attempted aggravated murder is against the sufficiency and manifest weight of the evidence because he was not definitively linked to any firearm at trial and appellee did not prove he acted with the specific purpose to kill Gunnish. As we noted above, Baker, Henry, the Save-A-Lot employee, and Gunnish testified appellant had a gun. The neighborhood witnesses saw appellant fleeing the scene shortly after the gunshots. Gunnish testified that appellant could have "dumped the bullets" but instead appellant fired directly at him, not once but three times. He tracked Gunnish's movements as he fired.

*Baugh*, 2018-Ohio-857 at ¶58. The court finds a reasonable juror, consistent with the state court's determination, could find that an individual who intentionally discharges a firearm aimed

14

at another individual has the specific purpose of trying to kill that individual. Petitioner cites no authority to the contrary.

For the reasons stated, the court recommends finding ground one to be without merit.

**B.  Ground Two: Right Against Self-Incrimination**

In ground two of his petition, Baugh maintains that his Fifth Amendment right against self-incrimination was violated when a police officer testified that Petitioner had asked for counsel before answering any questions. (R. 1, PageID# 5-6). In his state appellate brief, Petitioner explained that he believed his rights were violated because "the jury [was allowed] to consider the testimony that Appellant requested an attorney once he was Mirandized." (R. 8-1, PageID# 140; Exh. 15). The state appellate court addressed the argument as follows:

[*P59]   In his second assignment of error, appellant argues his constitutional right against self-incrimination was violated at trial. We disagree.

[*P60]   During the direct examination of Sgt. Brandon McCray by appellee, McCray described finding appellant in the woods with the assistance of Sgt. Hickman and K-9 Ricon. The K-9 bit appellant during the apprehension and McCray called an ambulance. As McCray and Hickman led appellant out of the woods, McCray Mirandized appellant because appellant asked why he was being arrested and they discussed the shooting, which appellant said he knew nothing about. McCray asked appellant where the gun was and appellant replied he didn't know what McCray was talking about. When McCray asked again, appellant requested counsel and questioning ceased.

[*P61]   At trial, after McCray described this interaction, the prosecutor asked McCray if he asked appellant where the gun was. Appellant objected to the question because he was in custody and invoked his right to remain silent. (T. III, 343). The trial court questioned McCray about the sequence of events and McCray stated that he had asked appellant several times where the gun is in case it remained in the woods. Appellant did not answer and said he wanted an attorney so questioning ceased. (T. III, 344-345). The trial court asked defense counsel if this satisfied his objection and defense trial counsel replied, "Not entirely." The trial court noted counsel could cross-examine McCray. (T. III, 345).

[*P62]   The prosecutor then asked McCray again whether appellant revealed the location of the gun. McCray clarified that questioning about the gun occurred after appellant was Mirandized but before he invoked his right to remain silent. Appellant's only response to questions about a gun were that he "didn't know what [the officers] were talking about," and he had gone into the woods to sit and drink. After appellant requested an attorney, all questioning stopped. (T. III, 346).

[*P63]   Appellant summarily argues that his right against self-incrimination was violated because the jury was permitted to use his silence against him. In *Doyle v. Ohio*, the United States Supreme Court stated, "* * * [I]t would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." 426 U.S. 610, 618, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). The Court reaffirmed its holding in *Doyle* in *Wainwright v. Greenfield*, 474 U.S. 284, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986), noting "[i]n *Doyle*, we held that Miranda warnings contain an implied promise, rooted in the Constitution, that 'silence will carry no penalty.'" *Wainwright* at 295, quoting *Doyle* at 618. The *Wainwright* court further stated at 295, "[w]hat is impermissible is the evidentiary use of an individual's exercise of his constitutional rights after the State's assurance that the invocation of those rights will not be penalized." (Emphasis added). In the instant case, appellant's silence on the matter of the gun arose during direct examination of the lead investigator about steps taken during appellant's apprehension and the investigation. The silence itself was not used as evidence of appellant's guilt.

[*P64]   Upon our review of the record, we find that the trial court did not abuse its discretion in overruling appellant's objections. Appellee did not use appellant's post-arrest silence for impeachment purposes in cross-examination or in closing argument. *State v. Mosley*, 5th Dist. Stark, 2002-Ohio-996, 2002 WL 358651, *5 (2002), citing *Doyle*, supra. Nor did the prosecution ever attempt to make evidentiary use of appellant's silence and/or request for counsel as evidence of appellant's guilt. *Id*., citing *Wainwright*, supra; see also *State v. Schirtzinger*, 5th Dist. Licking No. 3348, 1988 Ohio App. LEXIS 3243, 1988 WL 83507 (Aug. 3, 1988).

[*P65]   The record in this matter "discloses no intentional, concerted effort on the part of the prosecution to employ the post-arrest comment in any prejudicial manner." *See Schirtzinger*, supra, 1988 Ohio App. LEXIS 3243.

[*P66]   The exchange between the prosecutor and McCray was not for impeachment purposes, therefore we do not find a clear and unambiguous violation of *Doyle*. *State v. Riggenbach*, 5th Dist. Richland No. 05CA81, 2006-Ohio-2725, ¶ 58, citing *State v. Leach*, 102 Ohio St. 3d 135, 2004-Ohio-2147, 807 N.E.2d 335. "The gravamen of this due-process issue is whether the post-arrest, post-Miranda silence was used by the state as substantive evidence of guilt." *Id*. We find that it was not. The context of the questioning explained steps taken in

the police investigation: appellant had purportedly brandished a gun and shot at an officer, and after his apprehension police continued to search for the gun with a K-9 and a metal detector. Whether appellant was asked about the location of the gun is an obligatory explanation of a step in the investigation, not substantive evidence of appellant's guilt. *See, State v. Gooden*, 8th Dist. Cuyahoga No. 82621, 2004-Ohio-2699.

[*P67]   We find the evidence in the form of McCray's testimony was not offered as substantive evidence of guilt and did not violate Doyle and its progeny. *Riggenbach*, supra, 2006-Ohio-2725 at ¶ 60.

*Baugh*, 2018-Ohio-857 at ¶¶ 59-67.

Respondent contends that the state appellate court's decision was consistent with clearly established federal law, asserting that the record does not reveal that the officer was attributing any guilt to Baugh's decision to invoke his right to remain silent or his right to an attorney. (R. 8). Respondent further asserts the prosecutor also did not attempt to use Petitioner's silence as an inference of guilt. *Id*. Respondent contends the state appellate court's factual finding—that the State did not use Petitioner's silence as evidence of his guilt—is entitled to a presumption of correctness unless Petitioner rebuts the presumption by "clear and convincing evidence." Indeed, Petitioner has not identified any instances in the trial transcript that shows the State attempting to use Petitioner's invocation of his right to counsel or his right to remain silent as evidence of guilt.

Finally, Respondent asserts that even if there was a *Doyle* violation, such a violation is subject to harmless error review. "Improper remarks by a prosecutor about a defendant's right to remain silent do not constitute a structural error requiring automatic reversal." *Hall v. Vasbinder*, 563 F.3d 222, 235 (6th Cir. 2009) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 629, 638, 113 S. Ct. 1710 (1993)); *see also Mackey v. Russell*, 148 Fed. App'x 355, 362 (6th Cir. 2005) ("once having found a *Doyle* violation, we may not order a retrial (or grant a writ of habeas corpus)

without a determination that the violation substantially affected the outcome of the trial"). "Trial errors are those that occur 'during presentation of the case to the jury' and whose effect can 'be quantitatively assessed in the context of other evidence presented in order to determine whether [they were] harmless.'" *White v. Curtin*, No. 1:10-CV-1257, 2013 U.S. Dist. LEXIS 81881, at *28-29 (W.D. Mich. May 15, 2013) (quoting *United States v. Gonzalez-Lopez*, 548 U.S. 140, 148, 126 S. Ct. 2557 (2006)). The Supreme Court has held that "in § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' … whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard …." *Fry v. Pliler*, 551 U.S. 112, 121-22, 127 S. Ct. 2321, 2328 (2007)

Assuming *arguendo* that a *Doyle* error occurred, any error was harmless given the evidence presented in this case. The number of eyewitnesses that testified in this case who witnessed Baugh with a gun or observed or heard him fire shots is cumulatively overwhelming. Further, "[t]he right to an attorney and the right to remain silent are commonly known to society at large." *Mackey*, 148 Fed. App'x at 363. The court cannot find under the facts of this case that the jury's verdict was not the product of the significant volume of evidence presented, but instead the result of a negative inference from an isolated reference to the invocation of well-known rights. As such, ground two is without merit.

### C.  Ground Three: Federal Speedy Trial Rights

In ground three, Petitioner asserts that his speedy trial rights were violated under both the United States and Ohio Constitutions. (R. 1). To the extent Petitioner asserts a violation of Ohio law, statutory or constitutional, such a claim is not cognizable upon federal habeas review.[5]

The Sixth Amendment to the United States Constitution guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial ...." U.S. Const. Amend VI. The Supreme Court has recognized the federal constitutional right to a speedy trial permits some delays, which, depending on the circumstances of each case, cannot "be quantified into a specified number of days or months." *Barker v. Wingo*, 407 U.S. 514, 521-23, 92 S. Ct. 2182 (1972). The *Barker* decision established a balancing test in which the conduct of both the prosecution and the defendant are weighed to assess whether a speedy trial violation has occurred based on the length of delay between the date of indictment or arrest (whichever is earlier) and the date of trial. *Id*. at 530. The following four factors are to be considered under this balancing test: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right to a speedy trial; and (4) prejudice to the defendant. *Barker*, 407 U.S. at 530.

"The first [factor] … is actually a double enquiry. Simply to trigger a speedy trial analysis, an accused must allege that the interval between accusation and trial has crossed the

---

[5] "Because petitioner's second ground for relief is premised on his interpretation of his state statutory rights, it fails to raise a cognizable claim for federal habeas relief." *Herron v. Kelly*, 2013 U.S. Dist. LEXIS 89754, at *14-15, 2013 WL 3245326 (N.D. Ohio June 26, 2013) (Lioi, J) (citing *Norris v. Schotten*, 146 F.3d 314 (6th Cir. 1998); *Estelle v. McGuire*, 502 U.S. 62, 68, 112 S. Ct. 475 (1991)). "It is especially inappropriate for a federal habeas court to set aside a state court's ruling on an issue of state law where, as in the present situation, Ohio's appellate courts on direct appeal have already found appellant's claim of a violation of his statutory right to a speedy trial to be meritless." *Norris*, 146 F.3d at 328.

19

threshold dividing ordinary from presumptively prejudicial delay …." *Doggett v. United States*, 505 U.S. 647, 651-52, 112 S. Ct. 2686 (1992) (internal quotation marks omitted); *accord United States v. Robinson*, 455 F.3d 602, 607 (6th Cir. 2006) ("The first factor is a threshold requirement, and if the delay is not uncommonly long, judicial examination ceases."); *United States v. Smith*, 94 F.3d 204, 208-209 (6th Cir. 1996) ("the 'length of the delay is to some extent a triggering mechanism,' and unless there is a period of delay that appears, on its face, to be unreasonable under the circumstances, 'there is no necessity for inquiry into the other factors that go into the balance.'"). "A delay that approaches one year is 'presumptively prejudicial,' and triggers the speedy trial analysis." *United States v. Flowers*, 476 Fed. App'x 55, 60 (6th Cir. 2012) (citing *Doggett*, 505 U.S. at 652).

Baugh was arrested June 21, 2016, he was indicted August 5, 2016, and his trial commenced on January 24, 2017. (R. 8-1, Exhs. 1 & 12). Therefore, the time between his arrest and his trial was 216 days or seven months and two days. The Sixth Circuit Court of Appeals has explained that "[d]elays several months short of one year are not uncommonly long ..." *United States v. Gardner*, 488 F.3d 700, 719 (6th Cir. 2007). In fact, the *Gardner* court ceased its examination of the speedy trial issue where the delay was 265 days (or nearly nine months). *Id*.; *see also Perry v. Warden of Mansfield Corr. Inst.*, No. 5:13-cv-01196, 2014 U.S. Dist. LEXIS 183744, at *56 (N.D. Ohio Aug. 4, 2014) (White, M.J.) (finding that a 278 day delay between the date of the habeas petitioner's arrest and trial was not presumptively prejudicial); *United States v. Cummings*, 2012 U.S. Dist. LEXIS 137467, 2012 WL 4442738, at *4 (S.D. Ohio Sept. 25, 2012) (holding seven months and eight days was not presumptively prejudicial). Other circuit courts have found delays of approximately seven months insufficient to trigger a full speedy trial analysis under *Barker*. *See, e.g., United States v. Lugo*, 170 F.3d 996, 1002 (10th Cir. 1999)

("[T]he delay of approximately seven months, even if not excusable, is not 'presumptively prejudicial' and, therefore, a *Barker* analysis is not necessary."); *United States v McFarland*, 116 F.3d 316, 318 (8th Cir. 1997) (lapse of "a little over seven months" was "too brief to trigger review of Sixth Amendment speedy trial claim"); *United States v. MacDonald*, 635 F.2d 1115, 1117 (4th Cir. 1980) (delay of "at most seven months" found to be "entirely too short to 'trigger' further inquiry under *Barker*").

Therefore, the delay herein was not presumptively prejudicial and no further inquiry is necessary. Under such circumstances, the state appellate court's resolution of Petitioner's speedy trial claim cannot be said to run afoul of clearly established federal law.[6] Ground Three is without merit.

**D. Ground Four: Ineffective Assistance of Trial Counsel**

In ground four, Petitioner argues that trial counsel was ineffective when he "permitted [Petitioner's] trial to be scheduled past the date of the limited time waiver on December 19, 2016." (R. 1, PageID# 7). He posits that counsel did not engage in effective communication with him, as illustrated by his "two letters wondering why he had not yet been taken to trial before the December date."[7] *Id*.

---

[6] The state appellate court, while recognizing that speedy trial provisions are mandatory and are encompassed within the Sixth Amendment to the United States Constitution, confined its analysis to whether Petitioner was brought to trial in compliance with Ohio's speedy trial statute. *Baugh*, 2018-Ohio-857 at ¶¶70-80. This is not surprising, as Petitioner's state appellate brief devoted less than a page to the speedy trial argument and was firmly rooted in state law, and omitted any discussion of federal speedy trial rights. (R. 8-1, PageID# 141, Exh. 15). Respondent, however, has not asserted that Petitioner's ground three is unexhausted or procedurally defaulted. (R. 8). Nevertheless, the state court's conclusion—that no speedy trial right violation occurred—is neither contrary to nor an unreasonable application of clearly established federal law.

[7] Additional instances of alleged ineffective assistance of trial counsel that were raised in Petitioner's state appellate brief (R. 8-1, PageID# 143, Exh. 15) were not raised in the habeas

As stated above, a violation of Ohio's speedy trial statute does not present a cognizable claim for federal habeas review. Therefore, the court will only consider Petitioner's ground four argument through the lens of an ineffective assistance of trial counsel claim.[8]

Under the Sixth Amendment to the U.S. Constitution, "the right to counsel is the right to effective assistance of counsel." *Missouri v. Frye*, 566 U.S. 134, 138 (2012); *Joshua v. DeWitt*, 341 F.3d 430, 437 (6th Cir. 2003) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970). The Sixth Circuit discussed the general standard for ineffective assistance of counsel in *Monzo v. Edwards*:

> To establish ineffective assistance of counsel under *Strickland*, the defendant must show that his counsel's performance fell below an objective standard of reasonableness and that his counsel's errors were so serious as to prejudice the defendant.   Review of counsel's performance is highly deferential and requires that courts "indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance."   To establish prejudice, the defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.   A reasonable probability is a probability sufficient to undermine confidence in the outcome."

281 F.3d 568, 579 (6th Cir. 2002) (internal citations omitted); *see generally Strickland v. Washington*, 466 U.S. 668, 689 (1984).

A habeas court must approach the state court's rulings in a highly deferential manner. The Supreme Court stated that the "pivotal question" of whether the state court's application of

---

petition (R. 1, PageID# 7-8) and, therefore, are not addressed herein.

[8] Pursuant to Ohio law, "[a] person against whom a charge of felony is pending ... [s]hall be brought to trial within two hundred seventy days after the person's arrest." O.R.C. § 2945.71(C)(2). Furthermore, pursuant to O.R.C. § 2945.71(E), "[f]or purposes of computing time under divisions ... (C)(2) ... of this section, each day during which the accused is held in jail in lieu of bail on the pending charge shall be counted as three days." As such, the time limit for a defendant charged with a felony and held in jail is effectively reduced from 270 to 90 days. *See, e.g., State v. MacDonald*, 357 N.E.2d 40, 43, 48 Ohio St.2d 66, 70 (Ohio 1976).

*Strickland* standard was unreasonable is different from simply deciding whether counsel's performance fell below *Strickland*'s standard. *Harrington v. Richter*, 562 U.S. 86, 101 (2011). The focus on habeas review is "not whether counsel's actions were reasonable," rather, the question is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* at 105. The Court in *Richter* instructed that the petitioner must show that the ruling of the state court "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." 562 U.S. at 103; *see also Montgomery v. Bobby*, 654 F.3d 668, 676 (6th Cir. 2011) (*en banc*), *cert. denied*, 566 U.S. 991 (2012). The Supreme Court acknowledged that, under the AEDPA, this standard was "difficult to meet," however, it was "meant to be" so. *Id.* at 102; *see also Montgomery*, 654 F.3d at 676.

The state court of appeals addressed Baugh's ineffective assistance of counsel claim as follows:

> [*P82] To succeed on a claim of ineffectiveness, a defendant must satisfy a two-prong test. Initially, a defendant must show that trial counsel acted incompetently. *See, Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In assessing such claims, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id*. at 689, citing *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955).

> [*P83] "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Strickland*, 466 U.S. at 689. The question is whether counsel acted "outside the wide range of professionally competent assistance." *Id*. at 690.

> [*P84] Even if a defendant shows that counsel was incompetent, the defendant must then satisfy the second prong of the *Strickland* test. Under this "actual prejudice" prong, the defendant must show that "there is a reasonable probability

that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

[*P85] Appellant cites trial counsel's failure to object to the continuance past December 19. We note this court must accord deference to defense counsel's strategic choices made during trial and "requires us to eliminate the distorting effect of hindsight." *State v. Post*, 32 Ohio St.3d 380, 388, 513 N.E.2d 754 (1987). The basis for the motion to continue was to allow sufficient time for defense counsel's trial preparation. In light of our discussion of appellant's third assignment of error,[9] it is evident that even if defense trial counsel had objected to the extension beyond December 19, the objection would have been overruled because of the trial court's schedule.

[*P86] Additionally, despite appellant's inquiries about why the trial date was extended beyond December 19, the January 24 date was arrived at with consent of counsel. Appellant is bound by his counsel's waiver of speedy trial rights, even though the waiver might have been executed without his consent. *State v. Taylor*, 98 Ohio St.3d 27, 2002-Ohio-7017, 781 N.E.2d 72, ¶ 33, citing *State v. McBreen*, 54 Ohio St.2d 315, 376 N.E.2d 593, syllabus (1978).

*Baugh*, 2018-Ohio-857 at ¶¶82-86.

First, it must be noted that trial in this matter was scheduled for October 27, 2016—a date well within Ohio's speedy trial clock, given the defense's time waiver until December 19, 2016. On the eve of trial, defense counsel filed a motion to continue trial asserting counsel needed more time to adequately prepare a defense. (R. 8-1, PageID# 92, Exh. 4). The defense motion was granted. Thereafter, defense counsel filed a motion to dismiss the indictment on January 24, 2017, based on the State's alleged failure to try him within the time-frame set by Ohio's speedy trial laws. (R. 8-1, Exh. 11). Specifically, Petitioner's counsel had argued that Petitioner should

---

[9] In addressing the third assignment of error and elsewhere in the decision, the state appellate court noted that: Baugh had executed a limited time waiver on August 18, 2016, consenting to postponing trial until December 19, 2016; the jury trial was scheduled for October 27, 2016; two days before trial defense counsel had faxed a motion to continue the trial, which the trial court granted and which constituted a motion for enlargement of time; a motion to continue was filed on October 31, 2016 by defense counsel; and that the trial date was mutually selected by the court and defense counsel. *Baugh*, 2018-Ohio-857 at ¶¶32-35, 40, 74-79.

have been brought to trial by December 19, 2016, the last day of a limited time waiver executed by Petitioner. *Id*. The trial court disagreed that the time to try Petitioner had elapsed. As such, Petitioner cannot reasonably argue counsel was ineffective for failing to raise the issue, as it was, in fact, raised albeit unsuccessfully. As stated above, a federal court upon federal habeas review does not consider whether the state court correctly decided an issue of state law.[10]  In this ground for relief, the court only reviews counsel's actions and the state court's determination as to whether those actions were constitutionally deficient.

To the extent Petitioner's argument is founded on the notion that defense counsel should never have occasioned the delay by seeking the continuance of the trial scheduled for October 27, 2016, such a claim is frivolous. First, had counsel not sought a continuance, there is no reason to believe that trial would not have proceeded as scheduled thereby negating any claim that there was a speedy trial violation. Moreover, defense counsel would *not* have been acting as effective counsel if he had knowingly proceeded to trial unprepared.

If it is Petitioner's argument that defense counsel's initiated continuances should not be attributed to him, such a claim is untenable. In *New York v. Hill*, 528 U.S. 110, 118, 120 S. Ct. 659 (2000), the United States Supreme Court held that defense counsel could effectively waive a defendant's right to be brought to trial within a specified time period under the Interstate Agreement on Detainers (IAD), which establishes procedures for the resolution of one state's

---

[10]  In any event, the testimony of the court's scheduler was unambiguous. Both the court and the prosecution was available to start trial by December 13, 2016. (R. 8-3, PageID# 296; Tr. 36). Defense counsel had indicated he was not available to start trial then. *Id*. Therefore, any delay was solely attributable to the defense. Pursuant to O.R.C. § 2945.72, the speedy trial clock is tolled by "[a]ny period of delay necessitated by reason of a … motion, proceeding, or action made or instituted by the accused," or by "[t]he period of any continuance granted on the accused's own motion …."

outstanding charges against a prisoner of another state, by agreeing to a trial date outside that time period, even without the defendant's express consent. The *Hill* decision explained as follows:

> Scheduling matters are plainly among those for which agreement by counsel generally controls. This case does not involve a purported prospective waiver of all protection of the IAD's time limits or of the IAD generally, but merely agreement to a specified delay in trial. When that subject is under consideration, only counsel is in a position to assess the benefit or detriment of the delay to the defendant's case. Likewise, *only counsel is in a position to assess whether the defense would even be prepared to proceed any earlier*. Requiring express assent from the defendant himself for such routine and often repetitive scheduling determinations would consume time to no apparent purpose.

*Hill*, 528 U.S. at 11 (emphasis added); *see also Taylor v. Illinois*, 484 U.S. 400, 417-18, 108 S. Ct. 646 (1988) ("Although there are basic rights that the attorney cannot waive without the fully informed and publicly acknowledged consent of the client, the lawyer has and must have full authority to manage the conduct of the trial.").

In sum, Petitioner has failed to identify any incompetent conduct by counsel, and therefore, the state appellate court's decision—finding no incompetence or ensuing prejudice—was neither contrary to nor an unreasonable application of the *Strickland* standard.

## IV.  Conclusion

For the foregoing reasons, it is recommended that Baugh's Petition be DENIED.

s/ *David A. Ruiz*

David A. Ruiz
United States Magistrate Judge

Date: June 10, 2021

## **OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.   Failure to file objections within the specified time may waive the right to appeal the District Court's order.   *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).   *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).